Filed 7/14/16  In re N.G. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re N.G., a Person Coming Under the Juvenile Court Law. | |
| | D069597 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ13327A) |
| v. | |
| N.G., Sr., et al., | |
| Defendants and Appellants. | |

APPEALS from an order of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Reversed with directions.

Rosemary Bishop, under appointment by the Court of Appeal, for Defendant and Appellant Jennifer G.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant N.G., Sr.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Daniela Davidian, Deputy County Counsel, for Plaintiff and Respondent.

Jennifer G. and N.G., Sr., separately appeal an order under Welfare and Institutions Code section 366.26[1] selecting adoption as the permanent plan for their son N.G., Jr., and terminating their parental rights.[2] Jennifer contends (1) because N.G. did not want to be adopted by anyone other than the maternal grandmother and she had not yet been approved to adopt him, the juvenile court erred in finding N.G. adoptable; (2) the court abused its discretion in denying a continuance to ensure N.G.'s adoptability before terminating parental rights; (3) the court erred in finding there was not a beneficial parent-child relationship between her and N.G. within the meaning of section 366.26, subdivision (c)(1)(B)(i) that precluded the termination of her parental rights; and (4) the court erred in finding the sibling relationship exception to termination of parental rights and adoption under section 366.26, subdivision (c)(1)(B)(v) did not apply.

The father contends the court erred in finding N.G. generally adoptable and in denying a continuance of the permanency hearing under section 366.26, subdivision (c)(3), which authorizes the juvenile court to identify adoption as the permanent placement goal and, without terminating parental rights, provide the public agency responsible for the adoption up to 180 days to locate an appropriate adoptive family,

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] To avoid confusion, we refer to N.G., Jr., as "N.G." and N.G., Sr., as "the father."

2

when the court finds the child is difficult to place for adoption. Jennifer and the father join in each other's arguments.

We reverse the order terminating parental rights and remand with directions for the court to continue the section 366.26 hearing under section 352, subdivision (a), pending completion of the home study to determine the maternal grandmother's suitability to adopt N.G.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Prior Dependency Case*

In March 2006 the San Diego County Health and Human Services Agency (the Agency) filed a petition on behalf of then-three-year-old N.G. under section 300, subdivision (b), alleging Jennifer excessively used methamphetamine and had been arrested for being under the influence of a controlled substance, child endangerment, and other drug related charges. The petition alleged Jennifer had a history of drug use and a filthy home that contained dangerous drugs and drug paraphernalia within N.G.'s reach. The court ordered N.G. detained out of Jennifer's home.

At a contested jurisdiction/disposition hearing, the court sustained the petition, ordered N.G. placed in the home of a relative, and ordered the Agency to provide reunification services to Jennifer but not to the father, who was incarcerated. N.G. was eventually placed with his maternal grandmother. Jennifer received 18 months of reunification services and succeeded in reunifying with N.G. The court terminated jurisdiction in November 2007.

3

*Present Dependency Case*

In February 2014, the Agency filed a petition on behalf of then-11-year-old N.G. that included a count under section 300, subdivision (b), alleging N.G. was at substantial risk of serious physical harm or illness because of Jennifer's inability to provide regular care for him due to mental illness, developmental disability, or substance abuse.[3] The petition specifically alleged that since December 2013, Jennifer had used heroin to excess, had a history of using illegal drugs, and admitted she was "an addict." On February 21, 2014, she was incarcerated for violating conditions of her probation, including the conditions that she report to her probation officer, not use illegal drugs, and complete a substance abuse program. The petition also included a count under section 300, subdivision (g), alleging that N.G. had been left without support because Jennifer was incarcerated and unable to arrange appropriate and adequate care, and the father stated he was currently unable to provide care for N.G.

The Agency's report for the detention hearing stated that Jennifer was arrested for probation violations on February 21, 2014, and would be in jail or drug treatment for an extended time. N.G. had disclosed that Jennifer slept a lot and he had seen her and her boyfriend having sex when he went to her bedroom in the morning to tell her there was no food for breakfast. His four-year-old half-sister Lia[4] showed N.G. pictures on

---

[3] The father states that N.G. is currently 14 years old. However, both petitions stated that he was born in January 2003, which would make him currently 13 years old.

[4] Lia was eventually placed with her biological father and is not a subject of this appeal

4

Jennifer's phone of Jennifer having sex with her boyfriend and engaging in other sexual conduct. N.G. described the sex videos to his school psychologist in detail.

Jennifer reportedly slept a lot and left the children to fend for themselves. The children often did not have food or Jennifer was unwilling to prepare food for them. She had continually exposed the children to her and others' drug use and violent gang behavior. Jennifer had recently left the children in the care of her male roommate, who was drinking alcohol. When Lia asked him for water, he yelled at her and told her to get it herself. He was drunk. N.G. told him not to yell at his sister. The roommate then picked the children up and pushed them onto a curb outside. That roommate was no longer living in the home, but there were other roommates and methamphetamine pipes had been found in the home.

N.G. told his school psychologist that he was afraid of his mother and fed up with her behavior, stating, "I can't take it anymore." He said Jennifer hit him and yelled at him and took everything out on him. She locked him in a small closet for time outs. She slept a lot and he had to go to her room to ask her to do things for him and Lia. If he did not get breakfast for him and Lia they would not eat. He thought Jennifer was crazy and needed help.

The father told the Agency social worker he would like to try to have N.G. live with him, but he was currently unable to care for N.G. because he was living in a "crowded" house with his mother, uncle, aunt, his girlfriend, and his girlfriend's son.

At the detention hearing in February 2014, the court found a prima facie showing had been made on N.G.'s petition and that continued care in Jennifer's home would be

5

contrary to N.G.'s welfare. The court ordered N.G. detained in the maternal grandmother's home and ordered that the parents be provided reunification services and liberal, supervised visitation.

The Agency's jurisdiction/disposition report filed in March 2014 stated that N.G. and Lia were detained in the maternal grandmother's home, which was being evaluated for relative placement. N.G. told the social worker, "I like it here and I'm safe." The maternal grandmother stated she was committed to caring for the children in her home.

Jennifer was incarcerated for ongoing substance abuse and her failure to undergo substance abuse treatment as a condition of her probation. She was not allowed to have any contact visits with N.G. and Lia during her incarceration because she was serving a sentence related to bringing drugs into the jail. She denied any recent substance abuse but the social worker reported there was "ample evidence to the contrary." Jennifer tested positive for methamphetamine and told a social worker, I have not used methamphetamine and I don't know how I got a positive test." She said she underwent methadone treatment for pain but stopped methadone use because she thought it would just be another addiction. She claimed she had "holes in [her] spine and lesions in [her] brain" that caused her pain.

Jennifer told the social worker that much of what N.G. said "was such a lie" and that the maternal grandmother was "such a liar." She stated that N.G. helped her with Lia because he offered to help, not because he had to, and that Lia saw pornography because N.G. showed it to her. She said the maternal grandmother had it out for her and had put a methamphetamine pipe in her room. When she was a child, the maternal grandmother's

6

husband gave her alcohol and crack cocaine and molested her, and she was in foster care briefly when she was 10 or 11 years old because the maternal grandmother overdosed on alcohol. The maternal grandmother also tried to commit suicide by taking 100 tranquilizers. Jennifer stated that one or two years ago, the maternal grandmother was fired for drinking on the job "and couldn't finish Serenity House."[5] However, both Jennifer and the father stated that N.G. and Lia were currently safe in the maternal grandmother's home.

The social worker confronted Jennifer with information that all of the people currently involved with her children were gang members, but Jennifer was adamant that she did not expose the children to a gang lifestyle. She said she was a "nerd mom" and not a gang member. The Agency was concerned that without its intervention, the children would continue to be exposed to drug use and gang lifestyle in their home.

In March 2014, the Agency filed an addendum report stating it would like N.G. to be assigned a CASA (court appointed special advocate) for educational purposes and be assessed for an IEP (individualized education program) to address his diagnosed ADHD (attention deficit hyperactivity disorder) and ODD (oppositional defiant disorder).

At the jurisdiction hearing, the court sustained the petition and made a true finding on the count under section 300, subdivision (b) by clear and convincing evidence, and dismissed the count under section 300, subdivision (g). The court declared N.G. a

---

5     North County Serenity House, Inc. is a nonprofit organization that provides substance abuse treatment to women.

dependent of the court, and removed him from Jennifer's custody. The court gave the Agency discretion to place N.G. with the maternal grandmother once the necessary final approvals were obtained and ordered the parents to comply with reunification services.

At a special hearing in August 2014, the Agency informed the court that it had cleared the maternal grandmother's home for the children's placement and that the children had been residing there "for some time now." The court ordered the children placed in the approved home of a relative.

In November 2014, Agency social worker Susan Melendez filed a status review report for the six-month review hearing. The children were placed in the maternal grandmother's home and were comfortable in her care. An aunt who lived in the home also provided the children stability and safety.

Jennifer was released from jail on November 4, 2014. She had not been eligible for reunification services during her incarceration and she was not currently in a parenting program or substance abuse program. She had no documented progress in either of those components of her case plan.

In September 2014, the father was arrested on numerous charges, including possession of a controlled substance for sale while armed, transportation of a controlled substance, and felon in possession of a firearm and ammunition. He was in federal custody and facing "many years of incarceration." He understood that N.G. would be an adult when he was released from custody.

The court held a six-month review hearing for Lia in November 2014, but continued the six-month review hearing for N.G. to March 2015 "in order to be informed

8

of the actual sentence [the] father may receive." The court found Jennifer had made some progress with her case plan but the father had made no progress. The court continued N.G.'s placement with the maternal grandmother, reunification services for the parents, and liberal supervised visitation with Jennifer.

Melendez filed a status review report for the 12-month review hearing in April 2015. The children remained placed with the maternal grandmother and continued to be comfortable in her care. Jennifer was not yet participating in a substance abuse program. Although she reported being on a waiting list for Serenity House, she was adamant that she did not require a residential substance abuse recovery program. Melendez's assessment was that Jennifer's minimization and denial of her substance abuse problem "prevented her from seeking out and successfully completing the services that would have helped her to obtain and maintain her sobriety."

Jennifer's supervised visits with the children had been mostly positive. However, Melendez had concerns about Jennifer's talking about the dependency case with the children, not putting the children's needs above her own or showing empathy for them, and inappropriately responding to the children's verbal and nonverbal signals.

N.G.'s CASA filed a report in April 2015. He stated that the maternal grandmother appeared to keep the children well-fed, clean, well-clothed and active. However, N.G.'s school counselor expressed concern that the maternal grandmother drank alcohol when she quit smoking. N.G. told the CASA he liked living with the maternal grandmother. N.G. was enrolled in sixth grade and was failing math, English, and science, but was doing well in social science and physical education. He had

9

recently started working with a tutor.  His school counselor reported that he had problems controlling his anger and he had been disciplined for getting physical with other students.

The court held a contested 12-month review hearing on June 4, 2015.  After hearing testimony from Melendez and Jennifer, the court found that returning N.G. to the parents would be detrimental and that Jennifer and the father had not made substantive progress with their case plans.  The factual basis for that finding as to Jennifer was that she needed to be in a substance abuse program on a consistent basis and to provide stable and appropriate housing.  The court found that "substance abuse [was] interfering with [Jennifer's] ability to parent her children[,]" and she was "still laboring under her addiction and [had] not made significant progress."  The court terminated Jennifer and the father's reunification services and set a section 366.26 hearing.

In September 2015, social worker Andrea Scott prepared the Agency's report for N.G.'s section 366.26 hearing.  The Agency recommended termination of parental rights and adoption as N.G.'s permanent plan.  N.G. had adjusted well to living in the maternal grandmother's home and he acknowledged the maternal grandmother as his primary caretaker.  The maternal grandmother wanted to adopt N.G. and provide him a life of permanency, stability, and safety.  She was eager to begin the home study process.

Jennifer still had no documentation of progress in the substance abuse component of her case plan.  She had tested positive for heroin on June 1, 2015, at Family Recovery Center shortly before she stopped attending that program.  The Agency continued to have concerns about both parents' ability to provide a safe and stable environment for N.G.

10

Specifically, the Agency was concerned about their substance abuse issues, gang activity and lifestyle, and inability to put N.G.'s needs above their own.

Scott reported that recent visits between N.G. and Jennifer were "often pleasant." N.G. appeared to enjoy the visits but did not look to Jennifer as his primary caretaker. He displayed no sign of emotional distress when separating from Jennifer at the end of visits and rejoining the maternal grandmother. Scott's assessment was that the benefit to N.G. of maintaining a relationship with the parents did not outweigh the benefits he would gain if parental rights were terminated and he were adopted. Scott reported that if the maternal grandmother were unable to adopt N.G., there were six possible families in San Diego County approved to adopt a child matching N.G.'s characteristics.

The CASA filed a report on October 1, 2015. He observed one visit between Jennifer and the children and reported that N.G. and Jennifer "appear[ed] to have a warm relationship." He stated, "These visits are great. [N.G.] wants to continue to see Lia." He thought N.G.'s visits with Lia should occur at least once a week and his family visits with Jennifer and Lia should continue as well.

The CASA had "numerous concerns about [N.G.'s] current placement." He was generally concerned that N.G. lacked appropriate supervision in the maternal grandmother's home. He reported that N.G. had been exposed to marijuana smoke in the maternal grandmother's home, had been taken to movies that were "too mature for his age," and that Lia had been inappropriately touched while living in the maternal grandmother's home. N.G. told the CASA that he (N.G.) could talk the maternal grandmother into anything; all he had to do was push her. He said that an aunt had taken

11

him to an R-rated movie and that he knew what marijuana smelled like because a friend of the maternal grandmother openly smoked it when he visited the maternal grandmother.

The CASA was also concerned that the maternal grandmother did not seem to take N.G.'s education seriously and had not been open to free services that would have helped him. The CASA did not feel comfortable recommending termination of parental rights. He stated, "While I feel [N.G.] could be adopted and [the maternal grandmother] is willing to adopt him, I have some concerns regarding whether this is the appropriate adoptive placement for [N.G.]." The CASA recommended the court continue the section 366.26 hearing "in order to further investigate [N.G.'s] potential adoptive home."

In November 2015, Scott filed an addendum report stating that the Agency continued to recommend termination of parental rights and adoption as N.G.'s permanent plan. She met with the maternal grandmother "to discuss the concerns that were brought to the Agency's attention." The maternal grandmother denied any alcoholic relapse or lack of supervision of N.G. in her home, and denied that N.G. had been exposed to marijuana in her home.

In December 2015, Scott filed an addendum report noting that Jennifer was still having supervised visits with N.G. and the visits were reported as pleasant. N.G. transitioned back to the maternal grandmother without incident. N.G. told Scott that he wanted to be adopted by the maternal grandmother and understood that adoption meant he may never see his parents again.

Jennifer filed a section 388 petition in December 2015 and an amended petition on January 5, 2016, asking the court to return N.G. to her care and change the order

terminating her reunification services and setting the section 366.26 hearing. As changed circumstances, Jennifer alleged she had attended 12-step meetings and "Smart Recovery," and had completed a four-month online substance abuse education course. On January 5, 2016, the court denied Jennifer's amended petition on the ground the court was unable to make a prima facie finding that there had been a sufficient change of circumstances to warrant returning N.G. to her care. The court also found that Jennifer had not carried her burden of showing it would be in N.G.'s best interests to be returned to her custody.

The court held the contested section 366.26 hearing on January 13, 2016, and received in evidence the Agency's report for the hearing and subsequent addendum reports, the CASA's report filed on October 1, 2015, and Scott's curriculum vitae. The court also received an "Emergency Response Referral Information" form that contained a report about Lia having been inappropriately touched over her clothes in June 2015 by the father's girlfriend's 14-year-old son while Lia was in the maternal grandmother's care.

N.G. testified that he wanted to live with the maternal grandmother permanently. When Jennifer's counsel asked if that meant he did not want an opportunity to return to his mother's custody later, N.G. stated, "If my mother does what she needs to do and she is doing what she's doing with the program, I want her to get into a better program, I think I'd like to have a chance to live back with my mom." N.G. further testified, however, that he understood Jennifer's parental rights would have to be terminated for him to be adopted and that he would not be able to live with her if her parental rights were terminated. He testified that he was asking for Jennifer's parental rights to be terminated. When asked if he was in agreement with the termination, he responded,

13

"Kind of, and yes." He explained that "my mom needs to grow up, and she needs to do what she's doing. And I heard that she's really not doing what she's doing right now." He understood that termination of Jennifer's parental rights meant he would not be able to visit her and when asked if he was in agreement with that, he responded, "If that's what needs to be, then yes."

N.G. testified that he was not willing to be adopted by anyone other than his maternal grandmother. When asked if "any family member you haven't met yet would be fine[,]" he said, "No, I would like it to be with my grandma." When asked what he would want to happen if his grandmother was not the person who was going to adopt him, N.G. responded, "Not live with another family that I don't know." Counsel then asked, "Would you want to stay with your grandmother anyway?" N.G. replied, "Yes." N.G. later reiterated that if his grandmother was not approved to adopt him he would want to stay with her anyway. The father's counsel asked him, "Are you opposed to being adopted by anyone except your grandmother?" N.G. responded, "Yes. I would not want to be adopted by anybody else."

The court also heard testimony from social worker Scott and Jennifer. Scott testified that N.G.'s placement with the maternal grandmother required waivers of the maternal grandmother's criminal history, which included two convictions of DUI (driving under the influence of alcohol), and her history with CWS (Child Welfare Services) concerning Jennifer's formerly being a dependent of the court due to the maternal grandmother's substance or alcohol abuse. Scott could not guarantee that the maternal grandmother would obtain similar waivers for her adoptive home study. Scott answered

14

affirmatively when Jennifer's counsel asked her if there "was an entry in the logs that the maternal grandmother was drinking again based on statements by [N.G.]."

After the close of evidence, the Agency argued that the court's options for N.G.'s permanent plan were adoption or legal guardianship, and that adoption was the "proper and best permanent plan for [N.G.]." The Agency argued that N.G. was specifically adoptable because it was "likely that there will be no impediment to the approval of the maternal grandmother's adoptive home study." The Agency argued N.G. was generally adoptable because there were at least six families in the area that wanted to adopt a child with N.G.'s characteristics. Accordingly, the Agency asked the court to terminate parental rights.

Jennifer argued that it was not clear that N.G. was specifically adoptable, citing various concerns about N.G.'s placement with the maternal grandmother that rendered it questionable whether the maternal grandmother would be cleared to adopt him. Jennifer also argued that the beneficial parent-child relationship and sibling relationship exceptions to adoption applied. Jennifer disagreed that N.G. was generally adoptable, largely because of his stated desire not to be adopted by anyone other than the maternal grandmother. Jennifer asked the court to either order a plan of legal guardianship, or, if the court intended to select adoption as N.G.'s permanent plan, to not terminate parental rights that day but rather continue the matter 180 days to make sure the maternal grandmother would be cleared to adopt N.G.

The father joined in Jennifer's argument and emphasized that N.G. was unwilling to be adopted by anyone other than the maternal grandmother. The father argued that

15

"continuing this matter to get an approved home study, even if we identify adoption as the permanent goal, is the correct thing to do."

N.G.'s counsel noted N.G.'s testimony that he wanted to be adopted by the maternal grandmother. Counsel agreed with the Agency's request to terminate parental rights, but added that "the request by parents' counsel to go out 180 days to get a better grasp on the [maternal grandmother's] home study is a reasonable request as well." The Agency again asked the court to make a finding of adoptability and "to go forward with the termination of parental rights at this time."

The court recognized the possibility that the maternal grandmother would not be approved to adopt N.G. However, the court stated, "The social worker has the background and experience for which the court feels comfortable to rely that the home evaluation process would be carried to its completion with a positive result for [the] maternal grandmother." Although the court had considered "continuing this to complete the home study process[,]" the court concluded "that [N.G.] is likely to be adopted, and that the maternal grandmother does wish to adopt him, and that the home study process [will] be positive for the grandmother."

Regarding the six families that would be interested in adopting a child with N.G.'s characteristics, the court acknowledged that "[N.G.] was very clear he does not wish to consider being adopted by anyone else. And I think this young man was very sincere about that." The court expressed the view that if the maternal grandmother were unable to adopt N.G., N.G. "will go through a process of evaluating the then existing circumstances and factor those into what he feels is in his best interest, and he will make

16

a decision [whether to consent to adoption by someone other than the maternal grandmother]. It may well be no. It could very likely be yes."

The court found by clear and convincing evidence that it was likely N.G. would be adopted and that none of the exceptions set forth in section 366.26, subdivision (c)(1)(B) applied. The court selected adoption as N.G.'s permanent plan, terminated parental rights, and referred N.G. to the Agency for adoptive placement.

## DISCUSSION

### I. *Adoptability Findings and Denial of Continuance*

Jennifer and the father contend the court erred in finding N.G. generally adoptable and in denying a continuance of the section 366.26 hearing until completion of process of determining whether the maternal grandmother's home will be approved for N.G.'s adoption. We agree.

"Although continuances are discouraged in dependency cases [citation], the juvenile court has discretion to grant a continuance upon a showing of good cause if it is not contrary to the best interest of the child. (§ 352, subd. (a).) We review the court's ruling on a continuance request for an abuse of discretion." (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1481.)[6] We conclude the denial of a continuance of N.G.'s section

---

6       The father contends that the court should have continued the section 366.26 hearing 180 days under section 366.26, subdivision (c)(3), which provides, in relevant part: "If the court finds that termination of parental rights would not be detrimental to the child . . . and that the child has a probability for adoption but is difficult to place for adoption and *there is no identified or available prospective adoptive parent*, the court may identify adoption as the permanent placement goal and without terminating parental rights, order that efforts be made to locate an appropriate adoptive family for the child,

366.26 hearing was an abuse of discretion because N.G. made it clear that he consented to be adopted only by the maternal grandmother, and at the time of the hearing there was a real possibility the maternal grandmother would be found unsuitable to adopt based on the concerns the CASA expressed about N.G.'s placement with her and other evidence, including her history of DUI convictions and alcohol abuse. Thus, terminating parental rights placed N.G. at risk of becoming a legal orphan, "a consequence the law abhors." (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1062, fn. 6 (*Carl R.*).)

Because N.G. testified that he would consent to adoption by his maternal grandmother *only*, he is adoptable *only* because the maternal grandmother is willing to adopt him. "[W]hen a child is deemed adoptable 'only because a particular caretaker is willing to adopt, the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child.' " (*In re Jose C.* (2010) 188 Cal.App.4th 147, 158.) The Court of Appeal in *In re Sarah M.* (1994) 22 Cal.App.4th 1642 (*Sarah M.*) identified three legal impediments to adoption under the Family Code, including Family Code section 8602, which provides: "The consent of a child, if over the

_____

within the state or out of the state, within a period not to exceed 180 days. . . . For purposes of this section, *a child may only be found to be difficult to place for adoption if there is no identified or available prospective adoptive parent for the child because . . . the child is seven years of age or more*." (Italics added.) The italicized language renders this provision inapplicable to N.G. because there is an identified prospective adoptive parent (the maternal grandmother).

18

age of 12 years, is necessary to the child's adoption." (*Sarah M.,* at p. 1650.)[7] If a child over the age of 12 years refuses to consent to his or her own adoption, the child's refusal to consent is a legal impediment to adoption that, as a matter of law, precludes a finding that the child is adoptable. (*Ibid.*)

We recognize that *Sarah M.*'s analysis regarding legal impediment to adoption is not directly applicable to N.G. because the legal impediment under Family Code section 8602 to N.G.'s adoption does not impede adoption by *his sole prospective adoptive parent* (the maternal grandmother). However, Family Code section 8602's consent requirement *is* a legal impediment to N.G.'s adoption by *any other prospective adoptive parent* who might be interested in adopting a child with his characteristics, because N.G. refused to consent to adoption by any other such prospective adoptive parent. Given N.G.'s refusal to consent to adoption by anyone other than the maternal grandmother, it was necessary for the court to carefully consider *any* impediment to the maternal grandmother's ability to adopt before ordering adoption as N.G.'s permanent plan.

We also recognize the general rule that "the suitability of the prospective adoptive family [or parent] does not constitute a legal impediment to adoption and is irrelevant to the issue of whether a child is likely to be adopted." (*Carl R..,* *supra*, 128 Cal.App.4th at

---

[7] The other two legal impediments specified in *Sarah M.* are Family Code section 8601, which requires a prospective adoptive parent to be at least 10 years older than the child, with certain exceptions, and Family Code section 8603, which provides that a married person who is not lawfully separated from his or her spouse may not adopt a child without the consent of the spouse if the spouse is capable of giving consent. (*Sarah M., supra,* 22 Cal.App.4th at p. 1650.)

p. 1061.) However, a necessary exception to that general rule arises where, as here, a child over 12 years of age refuses to consent to adoption by anyone other than one prospective adoptive parent or family. Under those circumstances, suitability of the prospective adoptive parent or family to adopt is relevant to the issue of whether the child is likely to be adopted because if the adoptive parent or family is found to be unsuitable, the child's refusal to consent to adoption by anyone else would be a legal impediment to adoption.

This court in *Carl R.* recognized an analogous exception to the general rule that "the suitability of the prospective adoptive family does not constitute a legal impediment to adoption and is irrelevant to the issue of whether a child is likely to be adopted." (*Carl R., supra,* 128 Cal.App.4th at p. 1061.) The *Carl R.* court noted that "[a] child who is specifically adoptable and who will need total care for life is at high risk of becoming a legal orphan if parental rights are terminated and the prospective adoptive family is later determined to be unsuitable. This could occur if the courts analyze only whether there is a legal impediment to adoption, as indicated by . . . *Sarah M.* . . . . To avoid rendering a total needs child a legal orphan, the assessment of the adoptability of such a child must necessarily include some consideration of whether the prospective adoptive parents can meet that child's needs, since if the prospective adoptive parents cannot meet the child's needs, the child cannot properly be found to be adoptable." (*Id.* at p. 1062.) Likewise, to avoid rendering a child 12 years of age or older who consents to adoption by only one adoptive parent or family a legal orphan, an assessment of the adoptability of such a child must necessarily include some consideration of whether the prospective adoptive parent

20

or family can complete the adoption, because if the prospective parent or family cannot adopt, the child cannot properly be found to be adoptable.

The Agency cites this court's opinion in *In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1333, fn. 3 (*Christopher L.*) for the proposition that Family Code section 8602 "does not apply here." In *Christopher L.*, a mother appealing the termination of her parental rights to her teenage son Christopher contended the juvenile court should have applied the child-objection exception to termination under section 366.26, subdivision (c)(1)(B)[8] (*Christopher L.,* at pp. 1328-1329, 1333), and argued that Family Code section 8602 applied. (*Christopher L.,* at p. 1333, fn. 3.) The *Christopher L.* court noted that "although section 366.26 explicitly adopts certain provisions of the Family Code, there is no provision under section 366.26 adopting Family Code section 8602 for juvenile dependency court proceedings. Therefore, Family Code section 8602 is not directly applicable to our consideration of the applicability of section 366.26, subdivision (c)(1)(B)." (*Ibid.*) However, the court went on to note that "*at the time of Christopher's adoption hearing, Family Code section 8602 will be applicable and his adoption will require his express consent.*" (*Ibid.,* italics added.) As the italicized language illustrates, Family Code section 8602 is relevant to the determination of N.G.'s adoptability because it requires his consent to any adoption and creates the risk that he will become a legal orphan if the only adoption to which he will consent cannot be

---

8     Under section 366.26, subdivision (c)(1)(B)(ii), the juvenile court may find termination of parental rights detrimental to a child if "[a] child 12 years of age or older objects to termination of parental rights."

completed. If, as the Agency suggests, section 8602 did not apply to an adoption after termination of parental rights in a dependency case, it would not be one of the legal impediments to adoption noted in *Sarah M.* (*Sarah M., supra,* 22 Cal.App.4th at p. 1650.)

In summary, although there is no legal impediment under Family Code section 8602 to N.G.'s adoption by the prospective adoptive parent (the maternal grandmother), N.G.'s refusal to consent to adoption by anyone other than the maternal grandmother *is* a legal impediment to adoption by anyone other than the maternal grandmother that, as a matter of law, precludes a finding that he is generally adoptable. The evidence that six other families were interested in adopting a child with N.G.'s characteristics is irrelevant to the issue of whether he is generally adoptable because N.G. would have to consent to an adoption by one of those families, and he testified that he would not do so. Accordingly, the court's finding that N.G. is generally adoptable is not supported by substantial evidence.

The only way to protect N.G. from the risk of being rendered a legal orphan in the event the maternal grandmother is not approved to adopt him is to continue the section 366.26 hearing under section 352 pending the outcome of the evaluation of the maternal grandmother's suitability to adopt N.G.—i.e., the completion of her adoptive home study. If the maternal grandmother is not ultimately approved for adoption, the court can consider other options for N.G.'s permanent plan based on the circumstances existing at the time of the continued hearing, including whether N.G. continues to refuse to consent to adoption by anyone other than the maternal grandmother.

22

II. *Beneficial Relationship Exception to Termination of Parental Rights*

Jennifer contends the court erred in finding that there was not a beneficial parent-child relationship between her and N.G. within the meaning of section 366.26, subdivision (c)(1)(B)(i) that precluded the termination of his parental rights.[9] " 'At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citation.] 'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). [Citations.] Section 366.26, subdivision (c)(1)(B)(i), provides an exception to termination of parental rights when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." ' " (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1165 (*G.B.*).)

This court has interpreted "the 'benefit from continuing the [parent[-]child] relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the

---

[9] We address this assignment of error for the guidance of the parties and the juvenile court on remand in the event the issue is not rendered moot by circumstances existing at the time of the continued section 366.26 hearing.

23

sense of belonging a new family would confer.  If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

"A parent asserting the parental benefit exception has the burden of establishing that exception by a preponderance of the evidence.  [Citation.]  It is not enough to show that the parent and child have a friendly and loving relationship.  [Citation.]  ' "Interaction between [a] natural parent and child will always confer some incidental benefit to the child . . . ." '  [Citation.]  For the exception to apply, 'a *parental* relationship is necessary[.]'  [Citation.]  ' "While friendships are important, a child needs at least one parent.  Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent." ' "  (*In re J.C.* (2014) 226 Cal.App.4th 503, 529 (*J.C.*).)

Appellate courts have applied different standards of review to the parent-child beneficial relationship exception.  (See *In re K.P.* (2012) 203 Cal.App.4th 614, 621.)  Most courts initially applied the substantial evidence standard.  (See *ibid.*; *J.C.*, *supra*, 226 Cal.App.4th at p. 530.)  However, this court has applied a "hybrid standard," under which "[w]e apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would

24

be detrimental to the child." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.)[10] We will apply the hybrid standard.[11]

We conclude that Jennifer has not met her burden of showing the juvenile court abused its discretion in determining that termination of parental rights would not be detrimental to N.G. The court's determination is supported by substantial evidence that severing the natural parent-child relationship between N.G. and Jennifer would not greatly harm N.G. Jennifer's substance abuse had repeatedly interfered with her ability to form a beneficial and stable parent-child relationship with N.G. N.G. was removed from Jennifer's custody when he was three years old in his first dependency case, and was removed from Jennifer's custody in the present case after Jennifer was incarcerated for violating conditions of her probation, including the conditions that she not use illegal drugs, and complete a substance abuse program. N.G. told his school psychologist that he was afraid of Jennifer and fed up with her behavior and that he could not "take it anymore." He thought Jennifer was crazy and needed help.

---

10    Division Three of this District also recently applied the hybrid standard. (See *J.C.*, *supra*, 226 Cal.App.4th at p. 531.)

11    As a practical matter, the analysis is essentially the same under either standard of review. As noted above, " '[e]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only " 'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order [under review].'. . ." ' " (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

25

Although N.G.'s supervised visitation with Jennifer was mostly positive, Scott reported that N.G. did not look to Jennifer as his primary caretaker, and he displayed no sign of emotional distress when separating from her at the end of visits and rejoining with the maternal grandmother. Scott's assessment was that the benefit to N.G. of maintaining a relationship with his parents did not outweigh the benefits he would gain if parental rights were terminated and he were adopted, including permanency, stability, protection. The court was entitled to find Scott's opinion credible and give great weight to her assessment. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.)

The main evidence supporting the court's determination that termination of parental rights would not be detrimental to N.G. was N.G.'s own testimony that he wanted to live with the maternal grandmother permanently. Although N.G. testified that he thought he would like to have a chance to live back with Jennifer if she "does what she needs to do and she is doing what she's doing with the program," he further testified, that he was asking for her parental rights to be terminated, that he understood they would have to terminated for him to be adopted, and that he understood he would not be able to live with her if her parental rights were terminated. He also understood that termination of Jennifer's parental rights meant he would not be able to visit her and when asked if he was in agreement with that, he responded, "If that's what needs to be, then yes."

Based on N.G.'s testimony and the other evidence received at the section 366.26 hearing, the court could reasonably find that any benefit N.G. would gain from continuing his parent-child relationship with Jennifer would not promote his well-being to such a degree as to outweigh the permanency and well-being he would gain from being

26

adopted by the maternal grandmother.  Accordingly, the court did not abuse its discretion in determining that Jennifer did not have a beneficial parent-child relationship with N.G. within the meaning of section 366.26, subdivision (c)(1)(B)(i) that precluded the termination of her parental rights.

## II. *Beneficial Sibling Relationship Exception*

Jennifer contends the court erred in finding the sibling relationship exception to termination of parental rights and adoption under section 366.26, subdivision (c)(1)(B)(v) did not apply.[12]  As noted, " '[o]nce the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).' "  (*G.B., supra,* 227 Cal.App.4th at p. 1165.)  " 'The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption.' "  (*In re Hector A.* (2005) 125 Cal.App.4th 783, 791.)

"The sibling relationship exception applies where the juvenile court finds that 'substantial interference with a child's sibling relationship' is a 'compelling reason' to conclude that adoption would be detrimental to the child.  In making this determination, the court should take into consideration 'the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same

---

[12]     As with Jennifer's contention that the court erred in not finding the beneficial parent-child relationship exception to termination of parental rights applied, we address this assignment of error for the guidance of the parties and the juvenile court on remand in the event the issue is not rendered moot by circumstances existing at the time of the continued section 366.26 hearing.

home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption.'  (§ 366.26, subd. (c)(1)(B)(v).)"  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1317.)  We apply the substantial evidence standard of review to the court's factual findings regarding the applicability of the sibling relationship exception, "and the abuse of discretion standard to the court's weighing of competing interests."  (*In re D.O.* (2016) 247 Cal.App.4th 166, 174 (*D.O.*).)

" 'The author of the legislation adding the sibling relationship exception anticipated that "use of the new exception 'will likely be rare,' " meaning "that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption." ' "  (*D.O., supra,* 247 Cal.App.4th at p. 174.)  The statutory language requiring the court to find a *compelling* reason to determine that *substantial interference* with a sibling relationship would be *detrimental* to the child creates "a heavy burden for the party opposing adoption. . . .  Furthermore, the language focuses exclusively on the benefits and burdens *to the adoptive child, not the other siblings*.  The court is specifically directed to consider the best interests of the adoptive child, not the siblings, and must ultimately determine whether adoption would be detrimental to the adoptive child, not the siblings."  (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813 (*Daniel H.*), italics added.)

In the present case, the court found that N.G. had a "close and strong bond with his sister Lia[,]" and that "there would not be a substantial interference with [N.G.'s] sibling

28

relationship." However, to the extent adoption would interfere with that relationship, the court concluded that "considering [N.G.'s] long-term emotional interests, ongoing contact would not be in his best interests as compared to the benefit of legal permanence through adoption. Here again, it is an important relationship. But when balanced with the stability and benefits of adoption, adoption does trump the sibling relationship."

Substantial evidence supports the court's finding that N.G.'s adoption by the maternal grandmother would not substantially interfere with N.G.'s relationship with Lia. In *D.O.* this court recognized that in considering the applicability of the sibling relationship exception, the juvenile court may properly consider evidence that sibling visits are likely to continue in addition to the factors enumerated in section 366.26, subdivision (c)(1)(B)(v). (*D.O., supra,* 247 Cal.App.4th at pp. 175-176.) It is Jennifer's burden on appeal to establish that termination of parental rights would substantially interfere with N.G.'s sibling relationship. (*Id.* at p. 176.)

Scott reported that the maternal grandmother wanted N.G. to maintain an ongoing relationship with Lia and was willing to facilitate visits between the siblings in her home. The maternal grandmother had her own close relationship with Lia, who was her granddaughter, and she also wanted to maintain that relationship. The Agency hoped that N.G. and Lia would remain in contact, although what type of future contact they would have was unknown. Scott reported that it did "not appear that termination of parental rights will interfere with [N.G. and Lia's] relationship.

At the section 366.26 hearing N.G. testified that he had not been able to visit Lia as much as he had in the past because her father had not cooperated with the maternal

29

grandmother in arranging visits.  However, Scott testified that she had talked to Lia's social worker and expressed concern about the continuation of N.G. and Lia's sibling visitation, and that Lia's social worker was working with Lia's father on that matter.  Scott testified that she thought "that's probably why they were able to have a few visits now where [Lia's father is] okay with Lia spending time with [N.G.] and grandma for a few hours.  So I'm assuming that that situation is being resolved slowly, but surely."  Based on Scott's testimony, the court reasonably found that termination of parental rights would not result in the type of substantial interference with N.G.'s sibling relationship that would constitute a compelling reason to conclude that adoption would be detrimental to N.G.

Further, we conclude the court did not abuse its discretion in weighing the benefits N.G. would gain from adoption against the benefit he would gain by implementing some other permanent plan for the purpose of maintaining his sibling relationship with Lia, and concluding that to the extent adoption would interfere with that relationship, the benefits of adoption outweighed the benefit of maintaining his sibling relationship.  As noted, the statutory language requiring the court to find a compelling reason to determine that substantial interference with a sibling relationship would be detrimental to the child creates "a heavy burden for the party opposing adoption. . . . "  (*Daniel H., supra,* 99 Cal.App.4th at p. 813.)

Jennifer has not met her burden of showing termination of parental rights would be detrimental to N.G. under section 366.26, subdivision (c)(1)(B)(v).  Scott reported that "[a]lthough the siblings do have a relationship[,] the Agency believes that the relationship

30

is not so significant that the benefits of continuing the relationship would outweigh the benefits [of adoption].  Thus the Agency does not feel the sibling exception to adoption applies in this case."  The Agency's assessment sufficiently supports the court's determination that the sibling relationship exception to adoption did not apply to preclude termination of parental rights.

The Agency's assessment and the court's determination that the sibling relationship exception does not apply appear to have been largely based on the assumption that N.G. will ultimately be adopted by the maternal grandmother. If the maternal grandmother's ability to adopt N.G. had been conclusively established at the time of the section 366.26 hearing, the court's determination that the sibling relationship exception did not preclude adoption would have been sufficiently supported by the evidence and, therefore, not an abuse of discretion.[13] If the maternal grandmother is not ultimately approved for adoption, the applicability of both the sibling relationship and parent-child relationship exceptions to adoption will be rendered moot unless N.G. consents to being adopted by someone other than the maternal grandmother. The court will have to make whatever findings and orders are appropriate based on the circumstances existing at the time of the continued section 366.26 hearing.

## DISPOSITION

The order terminating parental rights and selecting adoption as the permanent plan for N.G. is reversed. The court is directed to continue the section 366.26 hearing pending completion of the evaluation of the maternal grandmother's suitability to adopt N.G. by the adoption agency performing her adoptive home study, and to determine N.G.'s

---

[13] At the section 366.26 hearing, Jennifer's counsel argued the sibling relationship exception would apply if N.G. were adopted by someone other than the maternal grandmother, but acknowledged that if N.G. were adopted by the maternal grandmother, "maybe the sibling exception doesn't apply because that sibling relationship may continue."

32

permanent plan based on the outcome of that evaluation and other circumstances existing at the time of the continued hearing.

NARES, J.

WE CONCUR:


HUFFMAN, Acting P. J.

AARON, J.